**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHRISTOPHER MONTICELLO<br>1037 Watson Court<br>Fogelsville, PA 18051 | : <br> : <br> : | |
| | : | CIVIL ACTION |
| Plaintiff, | : <br> : | No.: |
| v. | : <br> : | |
| KELLY IMPORTS, INC., d/b/a KELLY<br>CHRYSLER DODGE RAM MITSUBISHI<br>536 State Avenue<br>Emmaus, PA 18049<br>         and | : <br> : <br> : <br> : <br> : | **JURY TRIAL DEMANDED** |
| KELLY BUICK, INC., d/b/a KELLY<br>BUICK GMC<br>585 State Avenue<br>Emmaus, PA, 18049<br>         and | : <br> : <br> : <br> : <br> : | |
| GHK COMPANY, d/b/a KELLY<br>AUTOMOTIVE GROUP<br>544 State Avenue<br>Emmaus, PA 18049<br>         and | : <br> : <br> : <br> : <br> : | |
| GREGORY KELLY<br>544 State Avenue<br>Emmaus, PA 18049<br>         and | : <br> : <br> : <br> : | |
| CHRIS SARACENO<br>544 State Avenue<br>Emmaus, PA 18049 | : <br> : <br> : <br> : | |
| Defendants. | : <br> : | |

**CIVIL ACTION COMPLAINT**

Plaintiff, by and through his undersigned counsel, hereby avers as follows:

## I.    INTRODUCTION

1.      This action has been initiated by Christopher Monticello, Sr. (*hereinafter* referred

to as "Plaintiff") against the Defendants (as outlined in the caption of this lawsuit) for violations

of Title VII of the Civil Rights Act of 1964 ("Title VII - 42 U.S.C. §§ 2000, *et. seq.*), 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act ("PHRA").[1] As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

## II.    JURISDICTION AND VENUE

2.    This Court, in accordance with 28 U.S.C. § 1331, has jurisdiction over Plaintiff's claims because this civil action arises under laws of the United States.

3.    This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310 (1945) and its progeny. This Court has supplemental jurisdiction over Plaintiff's state-law claim(s) because such claim(s) arise out of the same common nucleus of operative facts as her federal claims asserted herein.

4.    Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and in addition, Defendants are deemed to reside where they are subject to personal jurisdiction, rendering Defendants residents of the Eastern District of Pennsylvania.

5.    Plaintiff is proceeding herein under the Title VII, and he has properly exhausted his administrative remedies by timely filing a Charge of Discrimination with the Equal

---

[1] Plaintiff is required to wait one (1) year for his claims to have been pending before the PHRC (from dual filing) before he is permitted to amend this lawsuit to include PHRA claims (unless Defendants waive administrative exhaustion for convenience of all parties). For notice purposes, Plaintiff identifies that he will seek leave to amend to include PHRA claims which will identically mirror his already-asserted federal claims in this lawsuit. A reference to the PHRA herein is for notice purposes only and is excluded at this time from the Count Section below.

Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety (90) days of receiving a notice of dismissal and/or right to sue letter from the EEOC.

### III.    PARTIES

6.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7.    Plaintiff is an adult individual, with an address as set forth in the caption.

8.    Kelly Imports, Inc., d/b/a Kelly Chrysler Dodge Ram Mitsubishi (hereinafter, "Defendant K-Imports" where referred to individually) is a domestic business corporation incorporated in Pennsylvania. Defendant K-Imports is located at 536 State Avenue, Emmaus, PA 18049 and operates as a motor vehicle dealership under various iterations of the d/b/a "Chrysler Dodge Ram Mitsubishi." In a Position Statement (Answer) to the EEOC (submitted on or about 9/27/24), Defendants wrote: "For the majority of Complainant's employment, he was employed by Kelly Imports, Inc. d/b/a Kelly Chrysler Dodge Ram Mitsubishi."

9.    Kelly Buick, Inc., d/b/a Kelly Buick GMC (hereinafter, "Defendant K-Buick" where referred to individually) is a domestic business corporation incorporated in Pennsylvania. Defendant K-Buick is located at 585 State Avenue, Emmaus, PA, 18049 and operates as a motor vehicle dealership under various iterations of the d/b/a "Kelly Buick GMC." In a Position Statement (Answer) to the EEOC (submitted on 9/27/24), Defendants wrote: Plaintiff "also served as the General Manager of [D-Buick]," in addition to working for Defendants as the "General Manager of [D-Imports]."

10.    GHK Company, d/b/a Kelly Automotive Group (hereinafter, "Defendant GHK" where referred to individually) is a domestic business corporation incorporated in Pennsylvania. Defendant GHK is located at 544 State Avenue, Emmaus, PA 18049 and operates through

numerous physical locations as a single enterprise (including locations Plaintiff managed). Defendant GHK is an abbreviation for the founder (and President) of all related entities, Gregory H. Kelly (an individual defendant in this lawsuit).

11.     Greg Kelly (hereinafter, "Defendant Kelly") is an individual, executive, and the highest-level manager of all corporate Defendants referenced in the caption of this lawsuit. He was directly involved in the decision making of Plaintiff's unlawful termination from employment. He is for example:

- Identified as the "President" of Defendant K-Imports in records filed with the Pennsylvania Department of State by Defendants.

- Identified as the "President" of Defendant K-Buick in records filed with the Pennsylvania Department of State by Defendants.

- Identified as the "President" of Defendant GHK in records filed with the Pennsylvania Department of State by Defendants.

12.     Chris Saraceno (hereinafter, "Defendant Saraceno") is an individual, high-level manager, executive, and ("Vice President and Partner") of Defendants' enterprise overseeing operations. He was directly involved in the decision making of Plaintiff's unlawful termination from employment.

13.     All persons and entities comprising the individual and corporate defendants shall hereinafter be collectively referred to as "Defendants." At all times relevant herein, Defendants acted by and through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

## IV.     FACTUAL BACKGROUND

14.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

4

15. Plaintiff is a 50-year-old man with decades of significant car dealership experience at many levels of operations and management.

16. Plaintiff was hired by Defendants (an enterprise of different dealerships operating through the "Kelly" brand name) effectively on or about August 25, 2023; and in total, Plaintiff was employed by Defendants for approximately 11 months until termination (in July of 2024, discussed *infra*).

17. Plaintiff was initially hired by Defendants to serve as the General Manager of Defendant K-Imports, doing business as "Kelly Chrysler Dodge Ram Mitsubishi."

18. *Because Plaintiff exhibited such a strong level of leadership and performance*, Defendants also asked Plaintiff to serve as the General Manager of Defendant K-Buick, d/b/a "Kelly Buick GMC." Plaintiff assumed responsibilities as a General Manager of Defendant K-Buick subsequent to his original hire.

19. Plaintiff physically worked for and managed Defendants K-Imports and K-Buick (once subsequently offered general management of the additional dealership as well) under the direction of Defendant GHK.

20. Plaintiff in all respects was functionally employed by Defendant GHK. Defendant GHK would be – under any legal standard – construed as Plaintiff's single, joint and/or integrated employer for many reasons. Defendant GHK operates each division, branch, and manufacturing line of its vehicles (such as Defendants K-Imports and K-Buick) *as if a single business enterprise* with respect to operational controls, management, policies, oversight, human resources, and overlapping resources. By way of examples only:

   a) Toward the end of his employment, Plaintiff was overseen and ultimately terminated by Defendant Saraceno (a Defendant GHK executive). Defendant Saraceno self identifies publicly as the "Vice President and Partner at Kelly

Automotive    Group"    overseeing    each    business    line.    *See* https://www.linkedin.com/in/chrissaraceno/

b) During his employment, emails were disseminated by John Clapso ("Clapso" – Facilities Manager of Lehigh and Berks) outlining contact information and communications for employees within in each line of business and general management (to coordinate sales). Clapso, in his emails, identified he was employed by Defendant GHK (and also coordinated business leads amongst each division and line of business illustrating overlapping resources and the same business enterprise).

c) Employees in low-level and high-level positions were transferred all the time amongst different locations and divisions for a variety of reasons.

d) Human resources for **all** lines of business (including Plaintiff's locations and other locations of Defendants) was all overseen by centralized human resources management, and in particular, by Kelly Bender ("Bender"). Bender was the "Human Resources Manager" for all of Defendant GHK's dealerships.[2] Bender self identifies publicly as an employee of Defendant GHK. *See* https://www.linkedin.com/in/kelly-bender-7a379423a/

e) Plaintiff took direction from Defendant Kelly, President of Defendant GHK, about and concerning financial matters, employee and personnel matters, sales, inventory, and all other aspects of the business.

f) Defendants' policies for their dealerships were all governed by the same policies disseminated by Defendant GHK and referencing the rules or policies of "Kelly Automotive Group."

g) Post-termination in July of 2024, Plaintiff was sent COBRA information by "Kelly Automotive Group" (Defendant GHK) under the "Kelly Automotive Group Health Plan."

h) During proceedings before the EEOC, Defendants *all utilized the same lawyer* to provide virtually identical responses and to jointly defend discrimination and retaliation allegations lodged by Plaintiff.

21.    Plaintiff worked 6 or 7 days per week for Defendants, typically worked 10-15 hours per day, and he was never once given any warning or discipline during his 11 months of employment (prior to his abrupt termination from employment).

---

[2] Upon information and belief, Bender now works for Defendants in a staff auditor role (and longer performs her prior role, although the circumstances of her demoted role are unknown).

22.    Between November 2023 through June of 2024, Plaintiff lodged numerous concerns to Defendants' management (and ownership) that he experienced unwelcome sexual advances from multiple women in the workplace and that there were pervasive sexual harassment concerns in general throughout Defendants. Such advances included but were not limited to provocative or sexual images being disseminated, among other forms of sexual harassment. Since Defendants had failed to engage in any meaningful remedy or mitigation of Plaintiff's concerns, Plaintiff adamantly escalated complaints through June of 2024 (even until in very close temporal proximity of his termination).

23.    Plaintiff made many verbal complaints (**over a dozen in total**) to varying levels of management about sexual harassment problems in the workplace (including of himself and about actions of others). Most of Plaintiff's complaints were in discussions or meetings, not via email. However, some emails reflected as follows:

- On December 12, 2023, Plaintiff emailed Bender, Defendant Saraceno, and Smith explaining they should have "sexual harassment" training "all" employees and "continuing education" in this regard. *This followed and preceded other concerns of ongoing sexual harassment Plaintiff was complaining about.*

- On June 12, 2024, Plaintiff emailed Bender, Defendant Kelly, and Defendant Saraceno concerns that "as many as 5" women "have sent explicit photos and videos of themselves to members of our team." Plaintiff explained this "will not be tolerated" and needs to "lead to termination." Plaintiff made it clear he was reiterating *prior concerns* previously expressed to such management.

24.    More examples ongoing sexual harassment problems will be referenced further in this Complaint. Separately, one of Plaintiff's employees worked in business development and assisted with social media management. Her name is Gabriela Peralta ("Peralta"). She was employed by Defendants for almost a year as of Plaintiff's separation from employment.

25.    Peralta is Hispanic. Defendant Saraceno told Plaintiff on several occasions to terminate Peralta. He said things like "she doesn't speak English," "get rid of the Spanish girl"

7

and "did you fire that Spanish girl yet," and other similar comments. Defendant Saraceno literally wanted her terminated *because of her ethnicity*.

26.    On several occasions, Plaintiff point-blank said what Defendant Saraceno is directing is "illegal," "discriminatory," "racist," and Plaintiff wasn't comfortable being involved in her termination for reasons stated. Plaintiff used opportunities to vocalize other concerns of discrimination in the workplace as well (regarding others, such as Heather Miller by way of example).

27.    Plaintiff did not terminate Peralta for 2 reasons: (1) Peralta was in fact a very good employee; and (2) Plaintiff was not going to be involved in an unlawful and discriminatory termination. Moreover, how Peralta communicated (linguistically) was the same manner that she communicated during her interview and hire. Plaintiff's objections in this regard were also in close temporal proximity to his termination from employment.

28.    Defendant Saraceno, a partner and Vice President of Defendants, is the highest-level executive in charge of overseeing all management and operations (under Kelly, an active but less involved owner than Defendant Saraceno). He may be upon information and belief bisexual (as to sexual orientation).

29.    Defendant Saraceno not only did nothing meaningful about Plaintiff's sexual harassment complaints for many months and was instead a proponent of sexist and racist hiring or termination practices, but he behaved inappropriately himself. He would ask Plaintiff to dinner or for drinks, make sexual gestures, jokes or comments, and even sent Plaintiff texts as if Plaintiff had his last name (as if they were together). Defendant Saraceno also touched other male employees, asked to see or feel their muscles and engaged in other inappropriate (similar)

8

behavior(s). Defendant Saraceno tried to have physical contact with Plaintiff when he could as well.

30.    Whether serious or in jest, it doesn't' matter. Defendant Saraceno is the person at the helm of Defendants who was supposed to enforce policies, ensure no impropriety in the workplace, and who in essence took no legal concern(s) seriously. He certainly dropped the ball in failing to assist Plaintiff with Plaintiff's ongoing concerns (explained *supra*).

31.    The Director of Human Resources ("HR") during Plaintiff's employ was Kelly Bender ("Bender").[3] She was not professional to say the least. By way of examples only: (1) when expressing concerns of unwelcome sexual harassment by staff, she laughed saying if by chance she was sent any dick picks Defendant Saraceno would have to look at them not her (making light of legitimate concerns, insinuating Plaintiff did something he didn't, and implying Defendant Saraceno would want to see pictures of male genitalia because he is bisexual); (2) Bender selectively addressed workplace problems and misconduct based upon relationships, family and friends; and (3) she encouraged a female (Martha Lopez) to lodge *a false* complaint against Plaintiff (an orchestrated plan that backfired when Lopez recanted HR's attempts to have her lie in a false statement).

32.    On June 20, 2024, Martha Lopez ("Lopez") signed a short letter saying, "HR asked me to write this letter," denying any relationship with Plaintiff and suggesting Plaintiff was sexually harassing her. This was however a complete fabrication by HR to try to create a false narrative and lie to justify discipline or termination of Plaintiff, as: (a) Plaintiff was in fact in a consensual relationship with Lopez; (b) Lopez later recanted her letter admitting to a consensual relationship; and (c) it was clear from her documentation and the circumstances that

---

[3] It is believed that Bender works in a demoted role as Staff Auditor as of now (post-termination of Plaintiff).

Defendants' management were pressuring her to lie and make false statements (in exchange for her remaining employed).

33.    For a short timeframe, Plaintiff was involved in a consensual relationship with Lopez (during the spring of 2024). Being so frustrated with Plaintiff's escalation of discrimination and sexual harassment concerns, Bender encouraged, directed, and orchestrated an HR complaint by this female employee. It was her friend, who later had to recant or alter her allegation(s) and confirm any relationship was consensual and not unwelcome with Plaintiff. Defendants' management agreed no policy prohibited such a relationship.

34.    Leading up to Plaintiff's termination, Saraceno had begun working in person around Plaintiff (more frequently) constantly scrutinizing him, management exhibited animosity towards Plaintiff, Plaintiff had one (1) location removed from his oversight (resulting in a substantial financial loss). Plaintiff was being severed from other tasks and roles (and left out of important discussions), and then he was terminated on or about July 9, 2024.

35.    Plaintiff was informed that his termination was because <u>he had engaged</u> in sexually harassing behavior (when Plaintiff was terminated). This is frankly outrageous. Plaintiff had made it clear he felt he was being retaliated against prior to his termination (for statutorily protected complaints). Leading up to his termination (after repeated complaints of sexual harassment and discrimination), Plaintiff told Defendant Saraceno and Defendant Kelly he was being retaliated against with being cut off from various communications, having responsibilities removed, and having false accusations being made about or concerning him.[4]

36.    Plaintiff was terminated on or about July 7, 2024. Importantly, when Plaintiff was terminated, he was informed it was due to allegations of sexual harassment about Plaintiff.

---

[4] Plaintiff complained of discrimination, sexual harassment (for others and himself), and about retaliation. These 3 different types of complaints are all statutorily protected.

However, following Plaintiff's termination (and Lopez recanting her claims after pressure from Defendant's HR personnel), Defendants altered the rationale for termination to unsatisfactory performance by Plaintiff.

37.    Defendants represented Plaintiff was terminated by Defendants solely for "unsatisfactory work performance" to the Pennsylvania Department of Labor ("DOL") in or about August of 2024 (for purposes of unemployment benefits). When defending claims before ethe EEOC, Defendant focused on Plaintiff being terminated for "performance" concerns.

38.    Between July 9th to July 10th of 2024 (after Plaintiff's termination), Defendant Saraceno:

- left Plaintiff a voicemail saying, "I thought we should talk," expressing that he noticed Plaintiff blocked him on Facebook (and social media), and wanting to make sure Plaintiff is "not personally mad at [Defendant Saraceno]."

- contacted Plaintiff via texts and by phone call inquiring if Plaintiff wanted to go to dinner sometime with him and telling Plaintiff he could try to recommend Plaintiff for the next store opening of Defendant GHK for Plaintiff to work in management therein.

39.    In addition to asking Plaintiff to dinner, offering to find Plaintiff another job, and expressing concerns about being blocked on some social media by Plaintiff, Defendant Saraceno was also continually following and "liking" Plaintiff's photos and posts on other social media in the week(s) following Plaintiff's termination from employment. None of this is consistent with believing Plaintiff engaged in "misconduct" by sexual harassment or that Plaintiff was an underperformer. And instead, it corroborates Plaintiffs' assertions that Defendant Saraceno seemed over-interested in Plaintiff (relative to what Plaintiff perceived as him expressing a romantic interest in Plaintiff).

40.    Following Plaintiff's termination, Defendants' leadership team began a campaign of retaliating against family members of Plaintiff and friends of Plaintiff who worked within

Defendants. Several of Plaintiff's friends or family members were terminated for an array of pretextual reasons, which is illustrative of further intent to retaliate against Plaintiff.

41.     Plaintiff had never worked in a workplace or within a work culture that was so grossly inappropriate, so poorly mismanaged by human resources or which was so transparently discriminatory and retaliatory in culture. To give an array of examples (and <u>only</u> samples) by way of illustration (as there are many more):

(1) Jeff Ring ("Ring" – a Finance Manager and then Sales Manager) was accused of sexual harassment buy Tianna Williams ("Williams"), resulting in legal claims that had to be settled (as of June 2024). He was suspected of doing drugs at work and engaging in sexual harassment of others. He also engaged in widespread fraud, at least 5-10 counts of fraud per month (known by leadership). In addition to other types of fraud, Ring would orchestrate that customers were purchasing lease-turn-in vehicles they no longer wanted and (was falsely) representing to financial institutions (such as Allied Financial) that the customer was purchasing the vehicle (as a customer would be able to purchase <u>at a substantial discount</u> per leasing contract). Otherwise, Allied would collect the turned in vehicle directly (as its asset). To get such vehicles under false pretenses (at a discount), Ring was having titles in customer's names sent to the homes of customers requiring them to turn later sign over to Defendants (upon receipt). There were numerous other insteands of fraud as well. **Despite all of this, Ring was not terminated**.

(2) Efrain Lopez ("Lopez" – a Used Car Manager) was accused of sexual harassment of several women, engaged in fraudulent deal funding, threw objects at work, and was known to do drugs at work. Lopez was moved to different locations due to sexual improprieties. Upon information and belief, Defendants are the subject of legal threats and claims as a result of Lopez's aforesaid conduct. With the knowledge of leadership, Lopez was also falsifying credit applications enhancing income of customers and making up employment information (to defraud lending institutions and to ensure vehicle sales). Lopez even caused staff to quit their employment. **Despite all of this, Lopez was not terminated for these specific reasons.**

(3) Bill Hav ("Hav" - a Vehicle Appraiser) was engaged in drug use at work, resided on Defendant's premises (in a recreational vehicle), took pictures of females in the showroom, falsified credit applications identifying false or inflated employment, and after Plaintiff attempted to terminate him - - Defendants' leadership retained (or rehired) him. He offered drugs at work to others, made sexual comments at work, and his drug abuse was so well known to management, they even bypassed drug testing him to retain him. **Despite all of this, Hav was not terminated (and kept).**

(4) Patrick Aritz ("Aritz" - Manager) grossly underperformed, engaged in theft, purchased a car from Defendants using fake rebates fraudulently, falsified repair orders, and was ultimately retained (after he tried to quit to avoid punishment). **Despite, this Aritz was retained.**

(5) Doug Marinos ("Marinos" – Finance Manager) threated staff members verbally and with physical harm, threated to kill an employee, and physically assaulted another person breaking his ribs. Leadership retained him.

(6) Corey Hopcko ("Hopcko" – Detail Manager) was caught engaging in massive theft by overbilling (sometimes triple billing) hours and stealing (over a long period of time). **Despite this, Defendants' leadership retained him**.

(7) Rick Zauck ("Zauck" – Product Specialist) came to work intoxicated on numerous occasions, was known in the workplace and tolerated as a "drunk" (which several referred to him as), and he created a very serious problem in the workplace by severely harassing another male employee, threatening to expose an employee as gay, creating false text messages as a form of harassment, and even created fake Only Fans Account which was tantamount to sexual harassment, cyberstalking and an egregious case of workplace bullying. Zauck was also engaging in fraud on behalf of Defendants. **Despite this, Defendants' leadership retained Zauck (only recently having moved him to a different area of Defendants' business to avoid having to terminate him).**

(8) Michelle ("Michelle" - Body Shop Manager) engaged in fraud, lost over $30,000.00, permitted customers to take vehicles and exit without paying properly, and after Plaintiff attempt to terminate her, Defendants' leadership retained (or rehire) her. **This was also despite her misrepresenting claims to insurance companies and mishandling many other matters on a consistent basis.**

**(9)** Tyler Higgins ("Tyler" – Sales) engaged in very serious improprieties at work including being caught selling drugs numerous times. **Defendants' leadership kept rehiring this person despite severe concerns with his misconduct.**

(10) Javier Rivera ("Rivera" – Service Writer) swore and threated employees and customers and was inappropriate in other ways (including drug use on premises and having engaged in business fraud for the benefit of Defendants), **yet leadership retained him.**

(11) Thadd Taylor ("Taylor" – Service Advisor) continually made sexual comments in the workplace to staff and customers, committed fraud on Zurich claims (and in other ways), did drugs at work, and continually did poor quality work. **Yet, leadership retained him.**

13

(12) Eidson Rodriguez ("Rodriguez" – Manager) took a dealership vehicle to New York without consent, engaged in sexual harassment of numerous females, his wife came into the dealership complaining of sexual harassment of other women and threatened to kill employees of the dealership, and was brought back to work **and retained by leadership.**

(13) Tyler Smith ("Smith" – Sales) took a dealership vehicle for over a week without consent which everyone agreed was "theft," was caught several times selling drugs at work, was texting staff solicitations to purchase drugs – and despite the foregoing – **Defendant Saraceno was trying to retain Smith and keep him employed.**

(14) Robert Santiago ("Santiago") swore at management, threw an object in the showroom, did drugs at work, a**nd he was retained as an employee** until deciding to quit of his own volition.

(15) Mark Burns ("Burns" – Fixed Operations Director) grossly underperformed, was responsible for losing in excess of $100,000.00 in inventory, lied that missing or expired parts could not be located, conspired with Jake Sutter (Parts Director) to sell parts online (such as through eBay and other sources) to pocket or embezzle funds of Defendants, and engaged in other forms of fraud. **Yet, leadership retained Burns.**

(16) Cliff Maleski ("Maleski" – General Sales Manager) cursed out banking representatives, a bank ceased doing business with Defendants because of him, he forged customer signatures, and engaged in varying types of fraud on behalf of Defendants. **Despite this, he was retained by leadership.**

(17) Anthony Arcues ("Arcues" – Mechanic) inappropriately sexually assaulted a secretary (and kissed her neck). **Despite he employee (Karen) complaining to management such as David Smith, Arcues was retained anyway.**

42.     The seventeen (17) examples set forth in Paragraph 41 of this Complaint are intended to be just that, examples. Plaintiff (and <u>many</u> witnesses on behalf of Plaintiff) will confirm and testify that: (a) employees and management (other than Plaintiff) engaged in *repeated terminable conduct* and were not terminated; (b) Defendants contend Plaintiff was terminated for mere "unsatisfactory performance;" and (c) when contrasted with these and

14

dozens more comparators Plaintiff will set forth - - Plaintiff's termination was completely pretextual.[5]

43.    Plaintiff was only employed with Defendants for about 11 months. Once he was assigned general management at a second location and was getting acclimated to all business dealings, financial matters, employee concerns, and a host of other matters, Plaintiff:

(1) Plaintiff complained about sexual harassment regarding himself;

(2) Plaintiff complained about sexual harassment concerns in the workplace that were not being properly addressed towards others (some of which are outlined in the examples *supra*);

(3) Plaintiff complained about racial discriminatory practices and discrimination;

(4) Plaintiff explained he would not be part of document forging, unlawful or predatory customer practices, and he provided Defendants Saraceno and Kelly several examples of what he was worried he could be held liable for (relative to fraud, theft, consumer misrepresentation, and a host of other illegalities). Defendants were financially struggling and were engaging in many inappropriate business practices; and

(5) Plaintiff complained of unlawful retaliation after being initially viewed as a proverbial rock star who was great but suddenly was being viewed as a problem because he was engaging in so many protected activities (wherein Plaintiff was being ostracized and mistreated).

44.    Plaintiff was terminated for completely manufactured and false reasons, as he performed better than other general managers (but was terminated). And he was terminated in close temporal proximity to engaging in the protected activities as outlined in this lawsuit (as well as for objecting to participating in many illegal practices within Defendants).

45.    Plaintiff attaches hereto and incorporates herein by reference a Declaration by Heather Miller, a former Business Development Manager, confirming: (a) prior to statutorily

---

[5] Just by way of other examples, David LaBar had a child with a prior General Manager and was not terminated for sexual relations at work. Dan Moyer referred to Defendant Saraceno as a "queer" to Defendant Saraceno and was not terminated. There are countless examples of employees at all levels who engaged in immediately terminable offenses, yet they were not terminated (unlike Plaintiff who suddenly was accused of "unsatisfactory performance").

15

protected activities asserted by Plaintiff, Plaintiff was very highly valued by Defendants; (b) Plaintiff was an excellent General Manager; and (c) Defendants' management engaged in or perpetuated a discriminatory and sexually harassing work culture. See Sworn Declaration of Miller, attached hereto as "Exhibit A."

**Count I**
**Violations of Title VII of the Civil Rights Act of 1964 ("Title VII")**
**([1] Sexual Harassment; and [2] Retaliation)**
**- Against Defendants K-Imports, K-Buick & GHK Only -**

46.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

47.      Plaintiff was: (a) subjected to a hostile work environment because of sexual harassment and retaliation; and (b) retaliatory terminated by Defendants for complaining of sexual harassment and racial discrimination within Defendants.

48.      Defendants' actions as aforesaid constitute violations of Title VII.[6]

**Count II**
**Common Law Wrongful Termination**
**(Retaliation)**
**- Against All Defendants -**

49.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

50.      It is clearly prohibited in this Commonwealth to terminate an employee for objecting to and/or refusing to commit unlawful or criminal acts. *See. e.g. Levito v. Hussman Food Service Co. Victory Refrigeration Div*., WL 1426 (E.D. Pa. 1990); *Woodson v. AMF Leisureland Centers, Inc.,* 842 F.2d 699, 702 (3rd Cir.1988); *Shaw v. Russel Trucking Line, Inc.,* 542 F.Supp. 776 (W.D.Pa.1982); *Dugan v. Bell Tel. of Pennsylvania,* 876 F.Supp. 713, 725

---

[6] Plaintiff's claims under Title VII are not against the individual defendants.

(W.D.Pa.1990). Plaintiff objected to being complicit or being responsible for overseeing varying types of criminal fraud (among other illegalities).

51.    Plaintiff was terminated for his refusal to oversee and perpetuate unlawful or criminal acts known to Defendants' management. Defendants Kelly and Saraceno, named in the caption of the Complaint, are corporate officers who participated and ratified the decision to terminate Plaintiff's employment - - making them individually liable herein.[7]

52.    These actions as set forth constitute common-law wrongful termination.

**Count III**
**Violations of 42 U.S.C. § 1981**
**(Retaliation)**
**- Against All Defendants -**

53.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

54.    Plaintiff was terminated for opposing illegal racial discrimination and discriminatory practices within Defendants.

55.    These actions as aforesaid constitute unlawful retaliation in violation of 42 U.S.C. § 1981.

---

[7] It is well established that corporate officers are liable for torts in Pennsylvania in which they participate. In *Rowles v. Automated Prod. Sys.,* 1999 U.S. Dist. LEXIS 21605 (M.D. Pa. 1999), the court explained **any** corporate officer is individually liable for their tortious actions, stating:

In *Wicks v. Milzoco Builders, Inc.*, 503 Pa. 614, 470 A.2d 86, 90 (Pa. 1983), the Pennsylvania Supreme Court recognized the participation theory as a basis for *corporate officer liability*:

Under the participation theory, the court imposes liability on the individual as an actor rather than as an owner. Such liability is not predicated on a finding that the corporation is a sham and a mere alter ego of the individual corporate officer. Instead, liability attaches where the record establishes the individual's participation in the tortious activity.

*Id.* at * 43.

17

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.       Defendants are to promulgate and adhere to a policy prohibiting sexual harassment, discrimination, and retaliation in the future against any employee(s);

B.       Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, and benefits.

C.       Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused by Defendants' actions;

D.       Plaintiff is to be awarded punitive damages as permitted by applicable law in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious, and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

E.       Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate;

F.       Plaintiff is to be awarded the costs and expenses of this action and a reasonable attorney's fees as provided by applicable federal and state law; and

G.       Plaintiff is to receive a trial by jury.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: _____
Ari R. Karpf, Esquire
Eight Neshaminy Interplex
Suite 210, Trevose, PA 19053
(215) 639-0801

Dated: <u>March 10, 2025</u>

18

Exhibit A

## DECLARATION OF HEATHER MILLER

I, Heather Miller, do hereby make this Declaration to the best of my recollection and based upon the best of my memory, personal observations, and personal experiences. I also make this Declaration subject to penalties of false swearing and perjury. And I understand that this Declaration may be used in legal claims being pursued by Christopher Monticello, Sr.

1.      I worked for Kelly Automative Group ("KAG") twice. First, I worked for KAG in the 2018 timeframe. I was then recruited to work for KAG again by David LaBar ("LaBar"). I returned to KAG and worked for the company from around February of 2023 until October of 2023. I was employed as a Business Development Manager (overseeing business development). During my 2023 period of employment with KAG, I was assigned to cover Chrysler, Mitsubishi, and the Risk-Free Lot by KAG (as to my role).

2.      Within my first approximate two (2) months of employment at KAG (in 2023), LaBar was terminated. I was handling duties, tasks, and matters well beyond the role in which I was hired due to short staffing, budget problems, and complete disorganization. They were being proverbially piled on me as time progressed.

3.      Following KAG's termination of LaBar, there was a much greater presence by Chris Saraceno ("Saraceno"). Saraceno was a Vice President and Partner of KAG. Saraceno was functioning as the General Manager of the aforesaid brands and overseeing operations until a new General Manager was hired.

4.      In the timeframe of August of 2023, Chris Monticello, Sr. ("Monticello") was hired as the General Manager overseeing brands to which I was assigned. I overlapped Monticello for approximately three (3) months. During this three (3) month timeframe:

    a)  I witnessed Monticello come in around 7 AM and not leave until 9 PM most days (working earlier or later as needed).

    b)  I witnessed Monticello working 6 or 7 days per week, often working 80+ hour workweeks.

    c)  I witnessed Monticello put in place structures, enforce policies, and create expectations of people working under his direction.

5.      In sum, Monticello worked extremely hard, enforced policies, and he was creating significant organization internally. Moreover, our business sales and performance had drastically increased (as a direct result of Monticello). Monticello did not yell (like LaBar or other management), but he set expectations and expected people to adhere to policies.

6.      In the several months I overlapped Monticello, I witnessed several managers including Greg Kelly (President) and Saraceno (Vice President) say things like: he is doing great,

look at all of this progress in such a short time, sales are up, he is going to be our saving grace, etc… Before Monticello was hired, it was discussed and known internally that KAG was losing money, was short staffed, was grossly underperforming, and lacked leadership and structure.

7.      I then heard in mid-2024 (after I was no longer employed, as explained more below) that Monticello was supposedly terminated for performance concerns. This would shock me, as Monticello worked really hard, was praised so highly for his achievements in his first 3 months and was head and shoulders above other general management (in terms of performance, respect, policy enforcement, and basic metrics).

8.      I was the only female in management dealing with customers. It was a very male dominated business, and I would equate the mentality of Kelly and Saraceno as treating or operating the business enterprise (KAG) as if it were in the 1980s (as to discriminatory perceptions and tolerating inappropriate behavior in the workplace).

9.      After Saraceno had overseen operations (post-termination of LaBar), he made very discriminatory comments to me. He point-blank told me a man would perform better in my role and that he was going to demote me. He made several direct discriminatory comments that I was being demoted on account of being a woman and suggesting a male would perform better than me. In my opinion and based on my experiences - - Saraceno was entitled, had no filter, and didn't care what he did or said and the impact on the person he was communicating with (or those around). I objected to training my male replacement because of Saraceno's discriminatory views of woman, and I was terminated at the direction of Saraceno.

10.     The work environment at KAG was very inappropriate. There was extensive commentary that was discriminatory and harassing. To me, I would describe the place as an HR nightmare. Management would be talking openly about which women (employees or customers) they would want to bend over their desks (among many similar types of talk). Comments, gestures, and jokes were made frequently by male management in front of other management (as to inappropriate sexual commentary). That was the culture KAG created. Although I didn't work with Monticello long, it did appear that he was gradually trying to improve the culture and make the environment friendly, but professional. And he was always a consummate professional in the workplace, not engaging in any such sexually offensive banter or commentary.

_____

Heather Miller

Date: 3/10/2025

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

## CASE MANAGEMENT TRACK DESIGNATION FORM

|  |  |  |
|---|---|---|
| Christopher Monticello | : | CIVIL ACTION |
| v. | : | |
|  | : | |
| Kelly Imports, Inc., d/b/a Kelly Chrysler Dodge Ram Mitsubishi, et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.　　　　( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
　　and Human Services denying plaintiff Social Security Benefits.　　　　( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.　( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
　　exposure to asbestos.　　　　( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
　　commonly referred to as complex and that need special or intense management by
　　the court. (See reverse side of this form for a detailed explanation of special
　　management cases.)　　　　( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.　(x )

| | | |
|---|---|---|
| 3/10/2025 | | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-639-0801 | 215-639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: <u>Defendants place of business</u>

---

***RELATED CASE IF ANY:*** Case Number:_____ Judge:_____

1. Does this case involve property included in an earlier numbered suit?  Yes ☐

2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?  Yes ☐

3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?  Yes ☐

4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?  Yes ☐

5. Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation.  Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

**A. *Federal Question Cases:***

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Wage and Hour Class Action/Collective Action
☐ 6. Patent
☐ 7. Copyright/Trademark
☐ 8. Employment
☐ 9. Labor-Management Relations
☒ 10. Civil Rights
☐ 11. Habeas Corpus
☐ 12. Securities Cases
☐ 13. Social Security Review Cases
☐ 14. Qui Tam Cases
☐ 15. Cases Seeking Systemic Relief **\*see certification below\***
☐ 16. All Other Federal Question Cases. *(Please specify)*:_____

**B. *Diversity Jurisdiction Cases:***

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify)*:_____
☐ 7. Products Liability
☐ 8. All Other Diversity Cases: *(Please specify)*_____
_____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒ Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐ None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

MONTICELLO, CHRISTOPHER

**(b)** County of Residence of First Listed Plaintiff Lehigh
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Ari R. Karpf, Esq.; Karpf, Karpf & Cerutti, P.C., 8 Interplex Drive, Suite 210, Feasterville-Trevose, PA 19053; 215-639-0801; akarpf@karpf-law.com

## DEFENDANTS

KELLY IMPORTS, INC., D/B/A KELLY CHRYSLER DODGE RAM MITSUBISHI, ET AL.

County of Residence of First Listed Defendant Lehigh
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | **IMMIGRATION** ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII (42USC2000); Section 1981 (42USC1981)

Brief description of cause:
Violations of Title VII, Section 1981 and the PHRA.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
3/10/2025

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____